IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

HAMILTON DOWNS
HORSETRACK, LLC,

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

      Appellant,

v.

CASE NO. 1D16-3876

STATE OF FLORIDA,
DEPARTMENT OF BUSINESS
AND PROFESSIONAL
REGULATION, DIVISION OF
PARI-MUTUEL WAGERING,

      Appellee.

_____/

Opinion filed September 5, 2017.

An appeal from a Final Order of the Department of Business and Professional Regulation, Division of Pari-Mutuel Wagering.

Seann M. Frazier and Marc Ito of Parker, Hudson, Rainer & Dobbs, LLP, Tallahassee, for Appellant.

Jason L. Maine, General Counsel, Dwight O. Slater, Chief Appellate Counsel, and Chevonne T. Christian, Assistant General Counsel, Tallahassee, for Appellee.

JAY, J.

Hamilton Downs Horsetrack, LLC ("Hamilton Downs"), appeals a final order by the Florida Department of Business and Professional Regulation, Division of Pari-Mutuel Wagering ("the Division"), rejecting certain factual findings and legal

conclusions made by an administrative law judge ("the ALJ") following a formal hearing. Because the ALJ properly concluded that a violation did not occur as alleged in the administrative complaint, and because the Division should be estopped from prosecuting Hamilton Downs even if it did, we reverse.

I.

Hamilton Downs is a relatively new horse racing establishment located in rural Hamilton County, just south of the Florida-Georgia line. Glenn Richards is owner and managing member of Hamilton Downs. Richards has ambitious plans to turn Hamilton Downs into a first-class pari-mutuel facility complete with a cardroom, slot machines, an oval race track, starting gates, and grandstands. For now, however, Hamilton Downs exists as an L-shaped dirt track approximately 110 yards in length, in an open field, with a shed for betting, a covered box on stilts, and a barn.

Hamilton Downs holds a pari-mutuel permit to conduct quarter horse races. On March 15, 2013, the Division issued an Operating Day License ("the operating license"), authorizing Hamilton Downs to conduct quarter horse barrel match racing as in years past. The operating license set forth Hamilton Downs' 2014 racing schedule, which consisted of twenty quarter horse performances over a four-day period in mid-June, at a rate of four performances per day, with each performance consisting of eight individual races, for a total of 160 races.

Approximately six months before the 2014 meet was set to occur, the rule authorizing barrel match racing was declared invalid as an unadopted rule. See Fla. Quarter Horse Track Ass'n v. Dep't of Bus. & Prof'l Reg., 133 So. 3d 1118 (Fla. 1st DCA 2014). The Division advised Richards that Hamilton Downs would not be permitted to conduct barrel match racing as in years past, but that it could conduct "flag-drop" racing instead. According to Richards, he asked for information on the applicable rules, but the Division advised him there were no rules governing flag-drop racing.

Three weeks before the 2014 meet was scheduled to occur, a second unforeseen circumstance arose. The organization on which Hamilton Downs relied for its horses and riders pulled out of the event. Resolving that the show must go on, Richards made alternative arrangements. He rounded up college students for riders and an elderly herd of untrained horses as their racing steeds. The 2014 meet went off on schedule. Each race consisted of two horses. The ALJ described this scene very well:

> 22. The races must be seen to be believed. The 14 events for which video evidence was received show a series of races involving -- as a rule -- tired, reluctant, skittish, or disinterested horses moving at a slow pace down the dust-choked path. There was no marked starting line or finish line. The horses were often yards apart when [a] red rag-on-a-stick was waved [starting the race]. With one exception (performance 2, race 7), the gait of the "racing" horses ranged between a slow walk and a canter. Horses often simply stood at the starting line before slowly plodding down the track. In one instance, a horse actually backed up, until

a bystander took it by the lead, thereafter giving the horse a congratulatory slap on the rump when it began to move in a forward direction. [Louis] Haskell noted races in which riders fell off of their horses, or in which a horse left the course. He described numerous races, aptly, as noncompetitive because one or both of the entrants walked, including one race (day 3, card 3, race 5) in which the racing steed took 1 minute and 45 seconds to cover the 110-yard course. The overall quality of the videotaped races was about what one would expect of an entry-level campers' horse show held at the conclusion of a two-week YMCA summer camp.

The second race of the meet was a matchup between two horses owned by the same owner, Amie Peacock. This is what is known as a coupled entry. Where there is a coupled entry in a two-horse race, there can be no meaningful betting because a coupled entry is "considered a single betting interest for purposes of wagering." Fla. Admin. Code R. 61D-7.001(12). A bet placed on one horse is necessarily a bet placed on both horses, so every betting patron wins.

After this race occurred, a thirty-minute meeting was held between Richards and race officials to discuss how the race should be treated. Among those present was Charles Taylor—an investigative specialist for the Division—whose job it was to verify compliance with all rules and statutes at racing events. Also present was Louis Haskell, who, at the time, was a state steward for the Division. As a state steward, Haskell supervised compliance with state law and performed the responsibility of deciding whether each race should be declared official or a no contest.

During the meeting, Richards tried to ensure that the race was not subtracted from the 160 races he was required to conduct, or if it was, that he could make up the race on a different day. As a possible solution, Richards offered to rerun the race. However, the evidence established that this was not a recognized option; consequently, the proposal was roundly rejected.

Richards also offered to accept a no contest declaration from Haskell. Where a no contest is called, it is possible for a licensee to obtain a replacement race by requesting from the Division an amendment to the racing schedule. Richards was familiar with this procedure and was prepared to make the request to ensure that he performed all of his required races. Richards testified that he was told by Taylor and Haskell[1] that "there's nothing wrong with these. There's no rules. Let's go, let's continue on, let's finish them." Richards asked about other races as well. Each time, he was told "[t]here are no rules . . . go ahead with it." Ultimately, Richards' offer to accept a no contest was rejected, and Haskell declared the race official.

Months later, the Division filed an administrative complaint alleging, among other things, that Hamilton Downs failed to operate all the races scheduled in the

---

[1] In response to a question from the Division's attorney, Richards testified that "[y]our two state people, Chuck and LP, said there's nothing wrong with these. There's no rules. Let's go, let's continue on, let's finish them." "Chuck" refers to Charles Taylor, the Division's investigative specialist. We think it is clear that "LP" refers to Haskell—the Division's race steward—inasmuch as Taylor and Haskell were the only "state people" to whom Richards could have been referring.

operating license, in violation of section 550.01215(3), Florida Statutes, which requires each permitholder to "operate all performances at the date and time specified on its license." In other words, the Division alleged that Hamilton Downs failed to conduct all of the 160 races at the 2014 meet. Based upon Hamilton Downs' request, the matter proceeded to a formal administrative hearing.

At the hearing, the Division's theory of prosecution was two-fold. First, the Division argued that the quality of the races at the 2014 meet was so bad that, under the law, they did not constitute races at all. In his recommended order, the ALJ concluded that this argument was without merit, and, on appeal, the Division does not dispute this part of the ALJ's conclusions.

Next, the Division contended that the second race should not qualify as a race because it was not a pari-mutuel race on which betting could occur. The ALJ rejected this argument too, concluding as follows:

> [T]he Division's efforts to cobble together various statutory and regulatory definitions to create a standard by which coupled entry races are to be nullified does not meet the requirements that violations of law be limited to those pled, and that statutes authorizing penal relief be strictly construed, with any ambiguity construed against the Division.

The ALJ further concluded that the Division should be estopped from sanctioning Hamilton Downs for the alleged violation—even if the violation did occur—and ultimately recommended that the Division enter a final order dismissing the amended complaint.

The Division entered a final order in which it rejected and modified certain of the ALJ's factual findings and legal conclusions. The Division concluded that an alleged violation occurred because the second race was not a pari-mutuel race and that estoppel did not apply to the facts of the case. Consequently, it imposed a $1,000.00 fine against Hamilton Downs. This appeal followed.

## II.

Section 120.57(1)(*l*), Florida Statutes, provides that the agency may not reject or modify an ALJ's findings of fact unless the agency first determines from a review of the entire record that the findings of fact were not based upon competent, substantial evidence or that the proceedings on which the findings were based did not comply with the essential requirements of law. "When competent substantial evidence in the record supports the ALJ's findings of fact, 'the agency may not reject them, modify them, substitute its findings, or make new findings.'" Walker v. Bd. of Prof'l Eng'rs, 946 So. 2d 604, 605 (Fla. 1st DCA 2006) (quoting Gross v. Dep't of Health, 819 So. 2d 997, 1001 (Fla. 5th DCA 2002)). "Credibility of the witnesses is a matter that is within the province of the [ALJ], as is the weight to be given the evidence." Stinson v. Winn, 938 So. 2d 554, 555 (Fla. 1st DCA 2006). "The [ALJ] is entitled to rely on the testimony of a single witness even if that testimony contradicts the testimony of a number of other witnesses." Id.

An agency "may reject or modify the conclusions of law over which it has substantive jurisdiction." § 120.57(1)(*l*), Fla. Stat. When doing so, "the agency must state with particularity its reasons for rejecting or modifying such conclusion of law . . . and must make a finding that its substituted conclusion of law . . . is as or more reasonable than that which was rejected or modified." Id. An appellate court reviews an agency's conclusions of law de novo and "will defer to the agency's conclusions of law unless they are clearly erroneous or contrary to law." U.S. Blood Bank, Inc. v. Agency for Workforce Innovation, 85 So. 3d 1139, 1142 (Fla. 3d DCA 2012). "[I]n doing so, this court must give 'great deference to the agency's interpretation of the statutory policy it is to administer . . . [and] be moved to intervene only by clearly erroneous interpretations of a statute.'" Murciano v. State, 208 So. 3d 130, 134 (Fla. 3d DCA 2016) (quoting Bethesda Healthcare Sys., Inc. v. Agency for Health Care Admin., 945 So. 2d 574, 576 (Fla. 4th DCA 2006)).

The Division erroneously rejected the ALJ's conclusion that the Division failed to prove the alleged violation. While the second race may not have constituted a pari-mutuel race, Hamilton Downs was not charged with failing to conduct a pari-mutuel race. Instead, it was charged with failing to conduct a race. Specifically, the administrative complaint alleged that Hamilton Downs violated section 550.01215(3) by "failing to make 20 performances between June 18, 2014 and June 22, 2014 at a rate of four performances per day." "'Performance' means a series of

events, *races*, or games performed consecutively under a single admission charge." § 550.002(25), Fla. Stat. (emphasis added). "Race" is defined as a "contest for purse, stakes or entry fees, on an approved course, and in the presence of duly appointed racing officials." Fla. Admin. Code. R. 61D-2.001(15).

Here, it is undisputed that the second race occurred on a licensed, approved course. Furthermore, it is undisputed that the race occurred between two horses in the presence of duly appointed racing officials. Finally, the evidence demonstrated that the winner of each race received a purse of $100, and second place received a purse of $50. Therefore, the second race satisfied the definition of a "race" for purposes of determining whether Hamilton Downs committed the alleged violation. As the ALJ rightly observed, violations must be limited to those alleged in the pleadings. Cottrill v. Dep't of Ins., 685 So. 2d 1371, 1372 (Fla. 1st DCA 1996) ("Predicating disciplinary action against a licensee on conduct never alleged in an administrative complaint or some comparable pleading violates the Administrative Procedure Act.").

Moreover, even if a violation occurred as alleged, the ALJ properly concluded that the doctrine of equitable estoppel precluded prosecution of Hamilton Downs. "The elements which must be present for application of estoppel are: '(1) a representation as to a material fact that is contrary to a later-asserted position; (2) reliance on that representation; and (3) a change in position detrimental to the party

claiming estoppel, caused by the representation and reliance thereon.'" Council Bros., Inc. v. City of Tallahassee, 634 So. 2d 264, 266 (Fla. 1st DCA 1994) (quoting Dep't of Revenue v. Anderson, 403 So. 2d 397, 400 (Fla. 1981)). Generally, estoppel may only be applied in cases of misrepresentations of fact, not misstatements of law. Id. at 266. "Equitable estoppel will apply against a governmental entity 'only in rare instances and under exceptional circumstances.'" Id. (quoting N. Am. Co. v. Green, 120 So. 2d 603, 610 (Fla. 1959)).

> One seeking to invoke the doctrine of estoppel against the government first must establish the usual elements of estoppel, and then must demonstrate the existence of affirmative conduct by the government which goes beyond mere negligence, must show that the governmental conduct will cause serious injustice, and must show that the application of estoppel will not unduly harm the public interest.

Council Bros., 634 So. 2d at 266 (citing Alachua Cty. v. Cheshire, 603 So. 2d 1334, 1337 (Fla. 1st DCA 1992)).

The ALJ framed the basic issue as "whether estoppel as to the coupled entry race is warranted as a result of the effect of the 30-minute meeting held after the second race, and the decision by Mr. Haskell to declare the race to be 'official.'" After discussing the content of the "lengthy conversation" that took place during the meeting, the ALJ answered this question in the affirmative, finding that "[b]ased on the foregoing, by declaring the race to be official, the Division represented to Hamilton Downs that the race would be counted among those required under the terms of its permit, a representation of material fact that is contrary to the Division's

position in this proceeding." Although this was labeled as a conclusion of law, it was in reality a finding of fact.

We conclude that the ALJ's factual finding that Richards was misled was supported by competent, substantial evidence and, consequently, could not be disturbed by the Division. The evidence reflects that, during this meeting, Richards made every effort to satisfy race officials and ensure compliance with state law. He proposed at least two solutions, one of which was a viable course of action that would have enabled Hamilton Downs to obtain an additional, replacement race. However, according to Richards, Taylor and Haskell assured him there was "nothing wrong" with the race and that there were "no rules" governing flag-drop racing—a statement consistent with what Richards previously had been told by the Division. After the race was declared official, the participants moved forward with the next race. Months later, the Division changed its position. On this evidence, the ALJ could properly find that the Division made an initial representation that was contrary to its subsequent position.

It does not matter that Richards' testimony included hearsay statements by Taylor and Haskell. The statements were made by officials employed by the Division in the scope of their employment, meaning that the statements would be admissible in a civil action. See § 90.803(18)(d), Fla. Stat. (providing that "a statement by the party's agent or servant concerning a matter within the scope of the

agency or employment thereof, made during the existence of the relationship" is not inadmissible). Therefore, the statements were sufficient to support the ALJ's finding. See Harris v. Game & Fresh Water Fish Comm'n, 495 So. 2d 806, 808 (Fla. 1st DCA 1986) ("In administrative hearings, hearsay evidence may be used for the purpose of supplementing or explaining other evidence, but it shall not be sufficient in itself to support a finding *unless it would be admissible over objection in civil actions*.") (emphasis added).

We further conclude that Richards relied on the Division's representation to his detriment. Richards testified that he would have requested an additional race but for Haskell and Taylor's assurance that the second race counted and but for Haskell's declaration that the race was official. Such a holding does not harm the public interest and avoids a serious injustice. The public trust is undermined when the government punishes people for violations the government causes.

Accordingly, the final order is REVERSED, and the case is REMANDED for adoption of the recommended order. Prysi v. Dep't of Health, 823 So. 2d 823, 826 (Fla. 1st DCA 2002).

B.L. THOMAS, C.J., and WOLF, J., CONCUR.